*This opinion is subject to revision before
publication in the Pacific Reporter*

**2016 UT 7**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

CONILYN JUDGE,
*Respondent,*

*v.*

SALTZ PLASTIC SURGERY, P.C. and RENATO SALTZ, M.D.,
*Petitioners.*

No. 20140654
February 4, 2016

Third District, Salt Lake
The Honorable L. A. Dever
No. 090900609

On Certiorari to the Utah Court of Appeals

Attorneys:

Roger H. Hoole, Gregory N. Hoole, Salt Lake City, for respondent

Robert G. Wright, Mark L. McCarty, Brandon B. Hobbs,
Zachary E. Peterson, Salt Lake City, for petitioners

JUSTICE HIMONAS authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT and ASSOCIATE CHIEF JUSTICE LEE joined.

JUSTICE DURHAM filed an opinion concurring in the result.

JUSTICE JOHN A. PEARCE became a member of the Court
on December 17, 2015, after oral argument in this matter,
and accordingly did not participate.

JUSTICE HIMONAS, opinion of the Court:

## INTRODUCTION

¶ 1  After partially redacted versions of her nude pre- and post-operative photographs were aired on the evening news, Conilyn Judge filed a lawsuit against Saltz Plastic Surgery, P.C.,

and Renato Saltz , M.D., (collectively, Saltz) and against Fox News. The claims against Fox News were dismissed pursuant to a settlement agreement. Ms. Judge alleged five causes of action against Saltz: "(1) public[ation] of private facts, (2) false light, (3) intrusion upon seclusion, (4) breach of fiduciary duty, and (5) negligent employment and supervision." Saltz moved for and was granted summary judgment on all five claims. The Utah Court of Appeals subsequently reversed the grant of summary judgment for each of the five causes of action. We granted review as to the following two issues regarding the claim for publication of private facts: (1) whether we should adopt the requirement in section 652D(b) of the Restatement (Second) of Torts that plaintiffs must show that "the matter publicized . . . is not of legitimate concern to the public" and (2) whether the court of appeals erred in concluding, based on that provision, that disputed issues of fact precluded summary judgment on this claim. We also granted review as to whether the court of appeals erred in holding that disputed issues of material fact concerning the scope and meaning of a consent form signed by Ms. Judge precluded summary judgment on the claim for intrusion on seclusion.

¶ 2    For reasons explained below, we adopt the Restatement's legitimate public concern element for claims for publication of private facts, and we affirm the court of appeals' reversal of the grant of summary judgment on the claims for publication of private facts and intrusion on seclusion.

## BACKGROUND

¶ 3    In October 2006, Dr. Saltz performed an abdominoplasty and a breast augmentation on Ms. Judge.[1] Prior to surgery, Ms. Judge signed two consent forms entitled "Consent for Surgery/Procedure or Treatment." One form included the

---

[1] Because this case reached the court of appeals "[o]n appeal from a district court's summary judgment ruling, [the court of appeals] view[ed] the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Judge v. Saltz Plastic Surgery, PC*, 2014 UT App 144, ¶ 13, 330 P.3d 126 (internal quotation marks omitted). We likewise view the facts in the light most favorable to the nonmoving party. *See infra* ¶ 11.

following language (the other used "functionally identical" language): "I consent to be photographed or televised before, during, and after the operation(s) or procedure(s) to be performed, including appropriate portions of my body, for medical, scientific or educational purposes, provided my identity is not revealed by the pictures." *Judge v. Saltz Plastic Surgery, PC*, 2014 UT App 144, ¶ 2 & n.1, 330 P.3d 126.

¶ 4    In 2007, Fox News decided to produce a two-part news story about "the risks and benefits of plastic surgery, and how to select a reputable and qualified plastic surgeon." For this story, a Fox News reporter interviewed a woman who experienced serious medical complications following plastic surgery. In order to counterbalance the negative example, the reporter contacted Saltz's office to ask "whether Dr. Saltz had a patient with a positive surgical outcome who would be willing to be interviewed for the news story" about plastic surgery and how to choose a plastic surgeon. Saltz invited Ms. Judge to be interviewed for the story. Because of her interest in women's health issues and her desire to help "women make a more informed decision about how to choose a plastic surgeon and . . . be aware of why [they] might want to have plastic surgery and that it's okay," Ms. Judge agreed to participate in the news story. Ms. Judge "felt that [it] would be an educational piece for the public."

¶ 5    Ms. Judge was interviewed by the Fox News reporter on January 11, 2008, at Saltz's office. During the interview, Ms. Judge openly discussed her plastic surgery, stating that she was "really pleased" and describing the results. The interview included Dr. Saltz conducting a m ock medical examination of Ms. Judge, which was filmed for use as background footage. Ms. Judge wore a paper examination gown for the duration of the mock examination. She expressed concern "about the camera angles that might be used and wanted to ensure that the filming was appropriate and tasteful, showing no cleavage or thigh." After the mock examination, Ms. Judge posed for post-operative photographs showing the results of her surgery.[2]

---

[2] The facts indicate only that the photographs were taken on the same day as the interview, after the mock examination. Whether the post-operative photographs were understood to be

(cont.)

¶ 6    While Ms. Judge was changing back into her street clothes after the mock examination, the reporter asked Saltz's office manager for "before and after" pictures of Ms. Judge and other patients. According to Saltz, once Ms. Judge came out of the examination room, Saltz's office manager asked Ms. Judge, in the presence of the reporter and Dr. Saltz, for consent to release the clinical photographs for the news story, and Ms. Judge gave consent for the release. However, the reporter denied this account even though her denial subjected her employer, Fox News, to liability. And Ms. Judge avers that she did not consent to the release of the photographs to the news media. Later that day, Saltz's office manager emailed Ms. Judge's unredacted nude pre- and post-operative photographs to the reporter, identifying them by writing, in one email, "Here are Coni's before pictures" and, in another email, "[H]ere are Coni's after pictures."[3] Saltz "placed no restrictions on Fox News' use of [Ms. Judge's] clinical photographs in the email with which they were sent or otherwise."

¶ 7    Fox News selected two of Ms. Judge's photographs for use in the news story and redacted them by placing black bars across Ms. Judge's bust and pelvis. *Judge,* 2014 UT App 144, ¶ 6. The "photographs were taken from the neck down and did not show [Ms. Judge's] face," but showed her body "from neck to upper thigh." *Id.* ¶ 5. Fox News then used the redacted photographs in the January 31, 2008 news story about plastic surgery, identifying them by stating, "[T]his is Coni before; this is Coni after." *Id.* ¶ 6.

¶ 8    Once Ms. Judge discovered that her clinical photographs had been used in the story, she contacted Fox News and Saltz to ask what was going on, and the Fox News reporter told Ms. Judge that she got the photographs from Saltz. The broadcast, which was titled "Nip, Tuck and Nightmare," had already been aired on

---

for the interview or whether they were an additional set of post-operative photographs taken as part of Ms. Judge's medical treatment is not indicated by the available facts.

[3] The facts do not indicate whether the post-operative photographs provided to the Fox News reporter were those taken on the day of the interview.

the evening news and had also been posted on the Fox News website. Ms. Judge demanded that the photographs be taken off the website immediately. Fox News removed the photographs, re-edited the story, and kept the re-edited version of the story (which did not include Ms. Judge's photographs) on the website.

¶ 9    On January 12, 2009, Ms. Judge filed a lawsuit against Fox News and Saltz. The claims against Fox News were dismissed pursuant to a settlement agreement. Ms. Judge alleged five causes of action against Saltz: "(1) public[ation] of private facts, (2) false light, (3) intrusion upon seclusion, (4) breach of fiduciary duty, and (5) negligent employment and supervision." Saltz moved for and was granted summary judgment on all five claims. The court of appeals subsequently reversed the grant of summary judgment for each of the five causes of action. Saltz filed a petition for writ of certiorari on July 23, 2014, and we granted review as to the following issues regarding the claims for publication of private facts and intrusion on seclusion:

1.   Whether this Court should adopt the Restatement (Second) of Torts § 652D(b), which requires that "the matter publicized . . . not [be] of legitimate concern to the public," and whether the court of appeals erred in defining and applying that provision to conclude that disputed issues of fact precluded summary judgment on Respondent's claim of publication of private facts.

2.   Whether the court of appeals erred in reversing summary judgment dismissing a claim for intrusion on seclusion by holding there were disputed issues of material fact concerning the scope and meaning of a consent form signed by Respondent.

¶ 10 We adopt the Restatement's legitimate public concern element for claims for publication of private facts and affirm the court of appeals' reversal of the grant of summary judgment for publication of private facts and intrusion on seclusion.

## STANDARD OF REVIEW

¶ 11 "On a writ of certiorari, we review the decision of the court of appeals, not that of the district court, and apply the same standard[s] of review used by the court of appeals. We conduct

that review for correctness, ceding no deference to the court of appeals." *Watkins v. Ford*, 2013 UT 31, ¶ 18, 304 P.3d 841 (alteration in original) (internal quotation marks omitted). Because this case is on appeal from a summary judgment ruling, the court of appeals "view[ed] the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party and review[ed] the court's legal conclusions and ultimate grant or denial of summary judgment for correctness." *Judge v. Saltz Plastic Surgery, PC*, 2014 UT App 144, ¶ 13, 330 P.3d 126 (internal quotation marks omitted). Thus, we review the decision of the court of appeals for correctness.

## ANALYSIS

¶ 12 Saltz contends that the court of appeals correctly "concluded that a plaintiff alleging . . . public disclosure of private facts must demonstrate that the public has no legitimate interest in the private fact," but argues that the court of appeals erred in defining and applying that provision to conclude that disputed issues of fact precluded summary judgment on the claim for publication of private facts. Saltz also contends that the court of appeals erred in reversing summary judgment dismissing the claim for intrusion on seclusion by holding that there were disputed issues of material fact concerning the scope and meaning of the consent forms signed by Ms. Judge.

¶ 13 We first consider and adopt the requirement in section 652D(b) of the Restatement (Second) of Torts that for claims for publication of private facts, it must be shown that "the matter publicized . . . is not of legitimate concern to the public." Next, we determine that the court of appeals correctly defined and applied that provision to conclude that disputed issues of fact precluded summary judgment on the claim for publication of private facts. Finally, we determine that the court of appeals correctly reversed summary judgment on the claim for intrusion on seclusion based on disputed issues of material fact concerning the scope and meaning of the consent forms.

## I. FOR CLAIMS FOR PUBLICATION OF PRIVATE FACTS, PLAINTIFFS MUST SHOW THAT "THE MATTER PUBLICIZED . . . IS NOT OF LEGITIMATE CONCERN TO THE PUBLIC"

¶ 14  This is the first case in which we address the issue of whether to adopt the requirement in section 652D(b) of the Restatement (Second) of Torts that "the matter publicized . . . is not of legitimate concern to the public" as a fourth element for claims for publication of private facts. We set forth three elements for such claims in *Shattuck-Owen v. Snowbird Corp.*:

> (1) the disclosure of the private facts must be a public disclosure and not a private one; (2) the facts disclosed to the public must be private facts, and not public ones; [and] (3) the matter made public must be one that would be highly offensive and objectionable to a reasonable person of ordinary sensibilities.

2000 UT 94, ¶ 11, 16 P.3d 555 (citation omitted). In *Shattuck-Owen*, we also noted that "the Restatement (Second) of Torts § 652D (1977) contains another element, requiring that the matter made public not be of legitimate concern to the public" but, in light of our holding in that case, declined to decide whether to adopt that element. *Id.* ¶ 11 n.1 (internal quotation marks omitted). Today, we adopt this element as a fourth element for claims for publication of private facts.[4]

¶ 15 In adopting this fourth element, we consider it appropriate to provide some guidance regarding its application. We do not, however, fully develop the contours of the element because this is the first case before us and we anticipate that the

---

[4] Absent this fourth element, the test for claims for publication of private facts would be too broad, posing a risk to the freedom of speech and freedom of the press guaranteed by the First Amendment. The requirement that the matter made public not be of legitimate concern to the public imposes a reasonable constraint on claims for publication of private facts that is appropriate in light of the constitutional restrictions on the common law right of privacy.

contours will be developed over time in our case law. The Restatement's comment regarding "legitimate public concern" notes that "[t]he common law has long recognized that the public has a proper interest in learning about many matters." RESTATEMENT (SECOND) OF TORTS § 652D cmt. d (1977). In order to determine whether a matter is of legitimate public concern, courts evaluate its newsworthiness, taking into consideration the customs and conventions of the community. *Id.* at cmt. h. This inquiry may present a jury question, but the determination may also sometimes be made as a matter of law.

¶ 16 Legitimate public interest has been defined as "newsworthiness." *Shulman v. Grp. W Prods., Inc.*, 955 P.2d 469, 478 (Cal. 1998). "News," for purposes of this inquiry, is a concept that has essentially been defined by traditional publishers and broadcasters, "in accordance with the mores of the community," and includes publications about such topics as

> homicide and other crimes, arrests, police raids, suicides, marriages and divorces, accidents, fires, catastrophes of nature, a death from the use of narcotics, a rare disease, the birth of a child to a twelve-year-old girl, the reappearance of one supposed to have been murdered years ago, a report to the police concerning the escape of a wild animal and many other similar matters of genuine, even if more or less deplorable, popular appeal.

RESTATEMENT (SECOND) OF TORTS § 652D cmt. g (1977). The scope of matters of legitimate public concern is not, however, "limited to 'news,' in the sense of reports of current events or activities." *Id.* at cmt. j. Aside from such reports, newsworthiness also extends to "the use of names, likenesses or facts in giving information to the public for purposes of education, amusement or enlightenment, when the public may reasonably be expected to have a legitimate interest in what is published." *Id.*

¶ 17 But "[t]he extent of the authority to make public private facts is not . . . unlimited" either. *Id.* at cmt. h. In determining whether there is legitimate public concern, one must take into account whether there is a logical nexus between the information and a matter of legitimate public interest, the degree of intrusiveness, and the community's customs and conventions. In *Shulman*, for example, the Supreme Court of California found that

the information included in a broadcast was of legitimate public concern "where the facts disclosed about a private person involuntarily caught up in events of public interest bear a logical relationship to the newsworthy subject of the broadcast and are not intrusive in great disproportion to their relevance." *Shulman*, 955 P.2d at 478; *see also Campbell v. Seabury Press*, 614 F.2d 395, 397 (5th Cir. 1980) ("The privacy of [individuals who either have not sought or have attempted to avoid publicity] is protected, however, by requiring that a logical nexus exist between the complaining individual and the matter of legitimate public interest."); *Winstead v. Sweeney*, 517 N.W.2d 874, 877 (Mich. Ct. App. 1994) ("In *Campbell*, . . . there was a logical nexus between the facts published about the plaintiff and the matter of public interest.").[5] Furthermore, "account must be taken of the customs and conventions of the community," which also requires consideration of community mores. RESTATEMENT (SECOND) OF TORTS § 652D cmt. h (1977). Information is *not* considered to be of legitimate public concern "when the publicity ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own sake, with which a reasonable member of the public, with decent

---

[5] A logical nexus between information published and the matter of legitimate public interest is required not only in cases involving involuntary public figures but also in cases involving voluntary public figures. Voluntary public figures are those who have voluntarily placed themselves in the public eye. RESTATEMENT (SECOND) OF TORTS § 652D cmt. e (1977). While the legitimate public interest may extend further in cases involving voluntary public figures, it is not unlimited. *See id.* at cmt. h ("Some reasonable proportion is also to be maintained between the event or activity that makes the individual a public figure and the private facts to which publicity is given. Revelations that may properly be made concerning a murderer or the President of the United States would not be privileged if they were to be made concerning one who is merely injured in an automobile accident."). In determining the limits of legitimate public interest, "account must be taken of the customs and conventions of the community." *Id.* Ultimately, such customs and conventions, and "community mores," determine what is newsworthy. *Id.*

standards, would say that he had no concern." *Id.*; *see also Robert C. Ozer, P.C. v. Borquez*, 940 P.2d 371, 378 (Colo. 1997); *Green v. Chicago Tribune Co.*, 675 N.E.2d 249, 256 (Ill. App. Ct. 1996); *Winstead*, 517 N.W.2d at 877.

¶ 18  In certain cases, it is appropriate for courts to decide as a matter of law whether a given matter is of legitimate concern to the public. "If the court can determine, as a matter of law, whether the facts are within the realm of the public interest," the court may decide the issue on summary judgment. *Winstead*, 517 N.W.2d at 878. Summary judgment is appropriate in clear cases, where reasonable minds could not differ, such as *Toffoloni v. LFP Publishing Group, LLC*, where Ms. Benoit, a model and "professional woman wrestler," was murdered by her husband, a well-known professional wrestler. 572 F.3d 1201, 1204 (11th Cir. 2009). In that case, there was "no dispute that Ms. Benoit's death was a legitimate matter of public interest and concern." *Id.* at 1205 (internal quotation marks omitted). However, when an article about Ms. Benoit's life, career, and death published in a 2008 issue of *Hustler* magazine gratuitously included nude photographs of Ms. Benoit taken twenty years earlier, the court correctly held that there was no legitimate public interest in the published nude photographs because they "were in no conceivable way related to the 'incident of public concern' or current 'drama' [of Ms.] Benoit's death." *Id.* at 1204, 1208, 1211. Reasonable minds could not differ in that case; therefore, summary judgment was appropriate.

¶ 19  In cases where reasonable minds could differ about whether a matter is of legitimate public concern, however, summary judgment is not an option. If the court, "after consulting the relevant sections of the Restatement and reviewing the case law, . . . concludes that reasonable minds could differ concerning the newsworthiness of the information," then the issue is a jury question. *Winstead*, 517 N.W.2d at 878–79.

## II. DISPUTED ISSUES OF MATERIAL FACT PRECLUDED SUMMARY JUDGMENT FOR PUBLICATION OF PRIVATE FACTS

¶ 20  In this case, the court of appeals correctly held that summary judgment on the claim for publication of private facts was inappropriate because of disputed issues of material fact. The district court had held that "[t]he public had a legitimate interest

in [Ms. Judge's] redacted photographs because [Ms.] Judge voluntarily placed these facts before the public . . . by appearing on television to inform the public about choosing a good [cosmetic] surgeon and by making representations about her surgical results." *Judge v. Saltz Plastic Surgery, PC*, 2014 UT App 144, ¶ 32, 330 P.3d 126 (first, fourth, and fifth alteration in original) (internal quotation marks omitted). However, the dispute as to whether there was legitimate public interest in the photographs based on Ms. Judge's participation in the broadcast or whether the inclusion of those photographs was gratuitous or overly intrusive made summary judgment inappropriate in this case.[6]

¶ 21 Saltz argues that Ms. Judge's voluntary participation in the interview where she discussed her surgical results gave rise to a legitimate public interest in seeing her surgical result. Saltz also

---

[6] In addition to the issues regarding legitimate public interest in the context of claims for publication of private facts, the court of appeals also addressed the requirement that "a plaintiff . . . prove that the private fact has been disclosed publically." *Judge v. Saltz Plastic Surgery, PC*, 2014 UT App 144, ¶ 24, 330 P.3d 126. The court of appeals correctly identified the "key question" as "whether the communication was made in such a way that it was substantially certain the fact would become public." *Id.* As the court of appeals points out, "[a] factfinder could very reasonably and sensibly conclude that giving photographs to a reporter, at the request of that reporter, knowing that the reporter was preparing a story on the topic, made it 'substantially certain' that the photographs would be published." *Id.* ¶ 25. Add to this the fact that Saltz knew the reporter requesting the photographs was interviewing Ms. Judge for a story on the topic (in fact, Saltz had invited Ms. Judge to participate in the story in the first place, the interview took place at Saltz's office, and in connection with that interview Dr. Saltz himself conducted a mock medical examination of Ms. Judge, which was filmed for use in the story) and the fact that the reporter specifically asked for Ms. Judge's before and after pictures, and it becomes very clear that a reasonable factfinder could well conclude that when Saltz sent those photographs to the reporter, the photographs were substantially certain to be published. *See supra* ¶¶ 4–6.

explains that the photographs were used "to show the good outcome Ms. Judge discussed in the story and to contrast the photographs of the bad surgical outcome." Ms. Judge argues that her "consent[] to answer questions about her proceedings generally d[id] not render every aspect of [her life], let alone her confidential medical photographs, subject to public disclosure." She also maintains that "there is nothing otherwise newsworthy about [her] particular results" and that the publication of her photographs "neither strengthened the impact nor the credibility of the presentations nor otherwise enhanced the public's general awareness of the issues and facts concerning plastic surgery." As the court of appeals put it, "reasonable minds could differ on whether appearing on television to discuss cosmetic surgery gives rise to a legitimate public interest in viewing explicit photographic documentation of the results of the interviewee's surgery." *Judge*, 2014 UT App 144, ¶ 35. Because reasonable minds could differ as to this issue, which is critical to the claim for publication of private facts, summary judgment was inappropriate in this case.

### III.  DISPUTED ISSUES OF MATERIAL FACT PRECLUDED SUMMARY JUDGMENT FOR INTRUSION ON SECLUSION

¶ 22    The court of appeals correctly held that disputed issues of material fact concerning the scope and meaning of the pre-surgery consent forms signed by Ms. Judge precluded summary judgment for intrusion on seclusion. Ms. Judge signed two consent forms entitled "Consent for Surgery/Procedure or Treatment." One of the forms included the following language, which is at issue in this case: "I consent to be photographed or televised before, during, and after the operation(s) or procedure(s) to be performed, including appropriate portions of my body, for medical, scientific or educational purposes, provided my identity is not revealed by the pictures." *Judge v. Saltz Plastic Surgery, PC*, 2014 UT App 144, ¶ 2, 330 P.3d 126. The language of the other pre-surgery form is "functionally identical." *Id.* ¶ 2 n.1.[7] Saltz

---

[7] The second form reads, "I consent to the photographing or televising of the operation(s) or procedure(s) to be performed, including appropriate portions of my body, for medical, scientific or educational purposes, provided my identity is not revealed by the pictures." *Judge v. Saltz Plastic Surgery, PC*, 2014 UT App 144,

(cont.)

contends that this language authorized the use of Ms. Judge's pre- and post-operative photos in the news story about plastic surgery. Ms. Judge disagrees.

¶ 23  One issue regarding these forms is the existence of a Limited Consent Form used by Saltz, which Ms. Judge did not sign. This form reads, "By signing below I give Saltz Plastic Surgery/Renato Saltz permission to use my pictures for office presentations, company website, and book/media publications." If the pre-surgery consent forms already permit the use of clinical photographs for medical, scientific, or educational purposes in such mediums as book and media publications, the Limited Consent Form seems to provide no additional rights for Saltz. In fact, Saltz has conceded that if its interpretation of the language in the pre-surgery consent forms is correct, then the Limited Consent Form would be redundant.

¶ 24  Aside from the issue regarding redundancy of forms, the parties disagree about the plain meaning of the language in the pre-surgery forms. Specifically, the parties dispute whether the language of the pre-surgery forms authorizes release of the photographs or authorizes interoffice use only, and they also dispute the scope and meaning of the phrases "educational purposes" and "my identity is not revealed by the pictures." The district court apparently found no ambiguity in the forms, since it granted summary judgment on the claim for intrusion on seclusion; the court of appeals, however, found ambiguity and questions of fact in the pre-surgery consent forms and therefore reversed summary judgment on this issue. *Id.* ¶¶ 37–43. "[W]hether a contract is ambiguous is a question of law, which we review for correctness." *Watkins v. Ford*, 2013 UT 31, ¶ 19, 304 P.3d 841 (citation omitted). A contract term or provision is ambiguous "if it is capable of more than one reasonable interpretation because of 'uncertain meanings of terms, missing terms, or other facial deficiencies.'" *WebBank v. Am. Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 20, 54 P.3d 1139 (citation omitted). If there is no ambiguity, "the contract may be interpreted as a matter of law." *Id.* ¶ 19 (citation omitted). If, however, there is ambiguity, "the

¶ 2 n.1, 330 P.3d 126. "The parties make no distinction between the language used in each form." *Id.*

intent of the parties becomes a question of fact," and a "motion for summary judgment may not be granted if . . . there is a factual issue as to what the parties intended." *Id.* ¶ 22 (citations omitted).[8] As detailed below, we hold that the language of the pre-surgery forms is ambiguous regarding whether the forms authorize the release of photographs and regarding the scope and meaning of the phrases "educational purposes" and "my identity is not revealed by the pictures."

¶ 25 Whether the language of the forms authorize release of photographs is ambiguous. Saltz maintains that the plain language of the forms necessarily authorizes release of photographs: "A person cannot be televised without release of the images to third parties [and] . . . photographs would serve no educational purpose unless they were shown to third parties." Ms. Judge counters by claiming that she "did not consent to the release of anything." She maintains that the plain language of the form still has meaning even without implicitly authorizing the release of photographs, because the photographs could still be used for "various legitimate interoffice uses," such as to "evaluate her surgical results" and "to analyze and improve [Dr. Saltz's] methods, as well as train his staff." Thus, it is disputed whether Ms. Judge's signature on the forms authorized release of the photographs or whether the scope of her consent was more limited. Since the language of the forms is "capable of more than one reasonable interpretation" regarding whether they authorized release of the photographs, the forms are facially ambiguous.

¶ 26 The scope and meaning of the term "educational purposes" as it appears in the forms are likewise ambiguous. Saltz points out that the news story about plastic surgery was "an educational piece for the public." Ms. Judge likewise considered the story educational. In fact, she was motivated to participate in the story because of her interest in women's health issues and her

---

[8] Summary judgment, however, is appropriate in cases where undisputed extrinsic evidence establishes that no genuine issue of fact exists as to the meaning the parties intended for an ambiguous provision. *See, e.g.*, *Willard Pease Oil & Gas Co. v. Pioneer Oil & Gas Co.*, 899 P.2d 766, 770 (Utah 1995). Saltz has not introduced such undisputed extrinsic evidence in this case.

desire to help "women make a more informed decision about how to choose a plastic surgeon and . . . be aware of why [they] might want to have plastic surgery and that it's okay." Thus, both parties agree that the news story itself was educational. However, Ms. Judge disputes the meaning of the term "educational purposes" in the pre-surgery consent form, "assert[ing] that she never understood 'educational purposes' 'to mean that she was consenting to have her nude photographs released to the media to be aired on the evening news.'" As the court of appeals pointed out, "the relevant inquiry is not whether the underlying news story served an educational purpose but whether the release of [Ms.] Judge's photographs to the reporter promoted an educational purpose *within the meaning of the consent form.*" *Judge*, 2014 UT App 144, ¶ 40 (emphasis added). This question has not been resolved. Because the parties have "presented contrary, tenable interpretations" of the scope and meaning of the term "educational purposes," "the language of the [forms] is ambiguous such that the intentions of the parties cannot be determined by the plain language of the agreement." *WebBank*, 2002 UT 88, ¶¶ 19, 27 (citation omitted).

¶ 27 Finally, the parties disagree about the correct interpretation of the form's provision that Ms. Judge's identity would "not [be] revealed by the pictures." Saltz places great weight on the phrase "by the pictures," arguing that the photographs "did not show Ms. Judge's face or reveal her identity." According to Saltz, to interpret the provision as "preclud[ing] Dr. Saltz from disclosing Ms. Judge's name in conjunction with her pictures" would "render[] the phrase 'by the pictures' meaningless." Thus, Saltz posits that sending the photographs to a reporter in two emails that included the phrases "Here are Coni's before pictures" and "[H]ere are Coni's after pictures" did not violate this provision. The district court agreed with Saltz, granting summary judgment and finding no violation because "[t]here is no notation on any photo that would identify [Ms.] Judge." In reversing the district court's grant of summary judgment on this issue, the court of appeals correctly pointed out that there *is* a question of fact regarding what the form proscribes: "[w]hile the language of the consent form may reasonably be interpreted to be a prohibition on depicting [Ms.] Judge's face, it could also be read as forbidding Saltz from providing identifying information with the photographs." *Judge*, 2014 UT App 144, ¶ 42.

Saltz argues that "it was Ms. Judge's participation in the news story, not the emails with Ms. Judge's pictures attached[,] that revealed her identity." However, the claim that the emails with Ms. Judge's pictures attached—which specifically stated, "Here are Coni's before pictures" and "[H]ere are Coni's after pictures"—did not reveal Ms. Judge's identity strains the bounds of credulity. Under Saltz's posited interpretation of this provision, since every patient is required to sign such forms before surgery, Saltz could identify any and all of its patients by name anytime it uses their photographs, including on its company website, as long as it does so by providing identifying information with the photographs as opposed to the photographs themselves revealing its patients' identities. Saltz's interpretation of this provision is clearly unreasonable, and we reject that interpretation. However, we are not in a position to adopt Ms. Judge's interpretation as correct as a matter of law.[9] Therefore, for purposes of this appeal, we conclude that this provision is ambiguous.

---

[9] The concurrence likewise rejects Saltz's interpretation of the provision that Ms. Judge's identity would "not [be] revealed by the pictures" but goes further to aver that "the only remaining reasonable interpretation of the language, once Saltz's theory has been rejected, is that the language 'revealed by the pictures' encompasses the release of photographs accompanied by explicit identifying labels." *Infra* ¶ 33. In fact, the concurrence is "not persuaded that there are any . . . material facts in dispute" regarding the "scope and meaning of the pre-surgery consent forms," neither in regard to the "revealed by the pictures" language nor in regard to the "educational purposes" language. *Infra* ¶¶ 30, 33. At the same time, the concurrence concedes that "Ms. Judge did not request summary judgment below[,] and we are not in a position to grant her such relief on appeal." *Infra* ¶ 33. Despite this concession, the concurrence would effectively grant summary judgment in favor of Ms. Judge for the claim for intrusion on seclusion. Not only is such a grant not an option for purposes of this appeal because Ms. Judge has not requested summary judgment, but because no such request was made, Saltz did not have the opportunity or incentive to explain why granting summary judgment against it would be inappropriate and the grant of summary judgment would deny Saltz such an

(cont.)

16

¶ 28 In conclusion, the language of the consent forms is ambiguous and disputed issues of fact clearly remain regarding the meaning of the pre-surgery consent forms in the context of the Limited Consent Form as well as regarding the scope and meaning of the phrases "educational purposes" and "my identity is not revealed by the pictures," as used in the forms. Because of the existence of such ambiguity, "the intent of the parties [is] a question of fact" and "extrinsic evidence must be looked to in order to determine the intentions of the parties." *WebBank*, 2002 UT 88, ¶¶ 19, 22 (citations omitted). Therefore, the court of appeals correctly held that these disputed issues of material fact precluded summary judgment for Ms. Judge's claim for intrusion on seclusion.

## CONCLUSION

¶ 29 We adopt the Restatement's legitimate public concern element for claims for publication of private facts. Furthermore, we hold that the court of appeals correctly applied that element to the claim for publication of private facts and correctly found that there are disputed issues of material fact regarding the legitimate public concern element of the claim. Therefore, we affirm the court of appeals' reversal of the grant of summary judgment for publication of private facts. We also affirm the court of appeals' reversal of the grant of summary judgment for the claim for intrusion on seclusion because of the disputed issues of material fact regarding the meaning of the consent forms signed by Ms. Judge.

---

opportunity.

Furthermore, such a determination would be beyond the scope of the grant of certiorari in this case. We granted certiorari on the question "[w]hether the court of appeals erred in reversing summary judgment dismissing a claim for intrusion on seclusion by holding there were disputed issues of material fact concerning the scope and meaning of a consent form signed by Respondent." And we hold that the court of appeals did not err in so doing. *Infra* ¶ 28. The question does not leave room for us to go further and grant summary judgment in favor of another interpretation of a portion of the consent form, for which summary judgment has not even been requested.

JUSTICE DURHAM, concurring in the result:

¶ 30 Because I disagree with the court's analysis in Part III, I write separately to explain my views on the role of appellate review of the contract at issue in this case. The majority opinion concludes that the court of appeals correctly determined that there were "disputed issues of material fact" concerning the scope and meaning of the pre-surgery consent forms signed by Ms. Judge. I am not persuaded that there are any such material facts in dispute; the court of appeals was asked to interpret specific contractual language, and I do not believe that Saltz has offered any plausible interpretations of that language, let alone any extrinsic evidence that could constitute a "fact" capable of being disputed, that render it ambiguous. Absent ambiguity, it falls to the appellate courts to construe the language. *Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2015 UT 94, ¶ 24, __ P.3d __. And courts decide as a matter of law whether a contractual provision is ambiguous. *Keith v. Mountain Resorts Dev., L.L.C.*, 2014 UT 32, ¶ 17, 337 P.3d 213.

¶ 31 The language in question deals with the use of photographs taken of Ms. Judge, as follows:

CONSENT FOR SURGERY/PROCEDURE OR TREATMENT

. . .

5. I consent to be photographed or televised before, during, and after the operation(s) or procedure(s) to be performed, including appropriate portions of my body, for medical, scientific or educational purposes, provided my identity is not revealed by the pictures.

6. For purposes of advancing medical education, I consent to the admittance of observers to the operating room.

¶ 32 As the majority opinion points out, Saltz's view of this language renders a second form with identical language used by his office, and called a Limited Consent Form—which Ms. Judge did not sign—redundant. Furthermore, Saltz's construction of the foregoing language—that it reflects Ms. Judge's agreement that her medical photographs could be released with identifying information to the commercial media—is in my view entirely inconsistent with the consent form's plain language. While the term "educational," outside of the context of this particular form,

might be susceptible to a meaning as broad as Saltz claims here, when read in conjunction with the use of the term "medical education" in paragraph 6, it seems clear to me that the scope of the term must be limited to the context of medical treatment and related medical and scientific education. This reading is bolstered by the nature of the document itself. The form is labeled a "CONSENT FOR SURGERY/PROCEDURE OR TREATMENT." It is entirely focused on Ms. Judge's medical treatment, including use of tissue, risks, fees for services, use of anesthesia, etc. The notion that it covers the release of treatment-related documents for Saltz's publicity-related purposes is antithetical to the idea of a consent to treatment.

¶ 33   I also conclude that this court must construe the plain meaning of the language "provided my identity is not revealed by the pictures." Actually, the majority opinion does just that—observing that "Saltz's interpretation of this provision is clearly unreasonable, and we reject that interpretation." *Supra* ¶ 27. Nevertheless the majority appears to gratuitously consider the provision to be ambiguous and declines to interpret it. I cannot agree—the only remaining reasonable interpretation of the language, once Saltz's theory has been rejected, is that the language "revealed by the pictures" encompasses the release of photographs accompanied by explicit identifying labels, as happened here. Once again, I do not see any disputed evidence in this record that would support the notion of ambiguity in the language. It is true that Ms. Judge did not request summary judgment below and we are not in a position to grant her such relief on appeal, but that procedural circumstance does not require a remand for consideration of "ambiguities" or factual disputes that do not exist in the record. We have been asked to construe the language of the consent form, and I see no ambiguity requiring extrinsic evidence thereof on remand.

¶ 34   But even if one of the disputed consent form provisions were ambiguous, this court still must interpret the form as a matter of law because the parties have not presented any valid extrinsic evidence that would create a dispute of material fact. A contractual ambiguity is a prerequisite to the admission of extrinsic evidence purporting to resolve the ambiguity. *Ivory Homes, Ltd. v. Utah State Tax Comm'n*, 2011 UT 54, ¶ 12, 266 P.3d 751. If, however, the parties do not present extrinsic evidence, courts must resolve the ambiguity by using the usual

interpretative tools. No doubt in many cases parties do not present extrinsic evidence that is relevant to an ambiguous term—either because they elect not to or because there is simply no valid extrinsic evidence to be had. In such cases, courts are required to say what even an ambiguous contractual provision means in order to determine the rights and obligations of the parties under the agreement.

¶ 35   In this case, Saltz argued in the trial court that it was entitled to summary judgment because the signed consent form authorized it to release Ms. Judge's pictures to the news media with accompanying identifying information. Ms. Judge responded by arguing that the consent form did not give Saltz this authority. Ms. Judge also produced an affidavit in which she declared that she "never understood 'medical, scientific or educational purposes' to mean that I was consenting to have my nude photographs released to the media." But Ms. Judge's personal understanding of the meaning of the consent form's terms is not valid extrinsic evidence that the district court could consider. *Cf. Mind & Motion*, 2015 UT 94, ¶ 42 ("[L]atent ambiguities are *objectively* verifiable and ordinarily cannot be proven based on the parties' *subjective* understanding of contractual terms. Therefore, affidavits and other evidence that fails to identify a collateral matter are not 'relevant' to showing a latent ambiguity." (footnote omitted)).

¶ 36   Thus there was no valid extrinsic evidence relevant to the interpretation of the consent form for the district court to consider during the summary judgment proceeding. For this reason, I disagree with the majority's conclusion that "disputed issues of fact clearly remain regarding the meaning of the pre-surgery consent forms." *Supra* ¶ 28. In the absence of any extrinsic evidence, the only question before the district court (and this court) is what do the phrases "educational purposes" and "provided my identity is not revealed by the pictures" mean within the context of the consent form? Regardless of whether these phrases are deemed to be ambiguous or not, in the absence of valid extrinsic evidence presented by the parties, this is a legal question to be resolved by a court. It is not a factual question to be resolved by a jury.

¶ 37   I therefore agree with the majority's conclusion that Saltz was not entitled to summary judgment on the intrusion on

seclusion claim. But, as noted above, I arrive at this conclusion because I have determined as a matter of law that the consent form does not mean what Saltz says it means. I see no disputed issues of fact to be resolved on remand regarding the proper interpretation of the consent form.

———————